UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALBERT PICKETT, JR., *et al.*, | ) | Case No.: 1:19 CV 2911 |
| | ) | |
| Plaintiffs | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CLEVELAND, *et al.*, | ) | |
| | ) | |
| Defendants | ) | ORDER |

Currently pending before the court in the above-captioned case is Defendant City of Cleveland's ("Defendant" or the "City") Motion to Dismiss Plaintiffs' Class Action Complaint ("Motion"). (ECF No. 8.) For the reasons that follow, Defendant's Motion is granted in part and denied in part.

## I. BACKGROUND AND PROCEDURAL HISTORY

On December 18, 2019, Plaintiffs Albert Pickett, Jr. ("Pickett"), Keyonna Johnson ("Johnson"), Jarome Montgomery ("Montgomery"), Odessa Parks ("Parks"), and Tiniya Shepard (formerly known as Tiniya Hall) ("Shepard") (collectively, "Plaintiffs") filed a Class Action Complaint in this court. (ECF No. 1.) Plaintiffs are all African-American current or former customers of Cleveland Water. (Compl. ¶¶ 22–26, 73–113, ECF No. 1.) Cleveland Water is a department of the City. (*Id.* ¶ 27.) The Cleveland Codified Ordinances (the "CCO") govern

Cleveland Water's administration. (Mot. at PageID #104, ECF No. 8); *see also* CCO §§ 129.05, 535 *et seq.* In addition, Defendant is bound by a consent decree (the "*Colegrove* Order") as a result of *Colegrove v. City of Cleveland*, No. 74-1007 (N.D. Ohio June 25, 1987). (Compl. ¶ 40, ECF No. 1.)

Together, the CCO and the *Colegrove* Order require Defendant to complete a series of procedural steps before terminating a customer's water service. (Mot. at PageID #104–05, ECF No. 8; Consent Decree at PageID #44, ECF No. 1-1.) Plaintiffs allege that Defendant has a pattern of not providing these procedural safeguards to customers before terminating their water service. (Compl. ¶¶ 42–49.) Plaintiffs also allege that customers of Defendant are frequently given extremely high water bills even after the customers confirm that there are no leaks anywhere on their properties. (*Id.* ¶¶ 37, 86, 93, 100, 108.) Some customers were even assessed high water bills after Cleveland Water had already shut  off their water service. (*Id.* ¶ 87.) Plaintiffs allege that these high water bills are erroneous and are caused by Defendant's water meters incorrectly recording water usage. (*Id.* ¶¶ 8, 38.) Plaintiffs further allege that Defendant never gives customers who believe that their meters are inaccurately recording water usage an opportunity to contest their bills. (*Id.* ¶ 46.)

Twice a year, Defendant converts all overdue water bills into tax liens that are applied to the overdue customer's property ("water lien"). (Compl. ¶ 51, ECF No. 1.) Plaintiffs allege that there is no statutory minimum arrearage required to initiate the water lien process. (*Id.*) According to Plaintiffs, these water liens put properties at a higher risk of tax and/or property foreclosure and places the owner or tenant at risk of eviction. (*Id.* ¶ 52.) Further, Plaintiffs allege that the county treasurer can initiate foreclosure actions against the homeowner to recover unpaid water liens, but sometimes sells the water liens at auction to private investors who are also able to initiate foreclosure actions on a property themselves. (*Id.* ¶¶ 52–53, 57.)

Between 2014 and 2018, Cleveland Water placed more than 11,000 water liens on properties in Cuyahoga County, and nearly 6,000 residents were subject to property tax foreclosures. (Compl. ¶ 14, ECF No. 1.) Plaintiffs maintain that statistical evidence demonstrates that a majority of these water liens were placed in majority-Black Census blocks as compared to majority-White Census blocks, despite the fact that the majority of Cuyahoga County's population is White. (*Id.* ¶¶ 15–16, 64–69.) As a result, Plaintiffs allege that Defendant's policy of placing water liens on the properties of customers with overdue bills disproportionately impacts African-Americans. (*Id.* ¶¶ 124–132.)

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek to represent the following classes:

> (1) a class of all Black homeowners or residents in Cuyahoga County who have been obligated, within the last two years, to pay debt secured by their property stemming from amounts originally owed to Cleveland Water ("Water Lien Class");

> (2) a subclass of all Black homeowners or residents in Cuyahoga County who have been obligated, within the last two years, to pay increased mortgage escrow payments as a result of their mortgagee or mortgage service satisfying a debt secured by the property stemming from amounts originally owed to Cleveland Water ("Escrow Subclass");

> (3) a class of all persons who, within the last two years, had their water service disconnected by Cleveland Water and did not receive advance written notice of the shutoff or their right to request a hearing to dispute the impending disconnection ("Shutoff Class"); and

> (4) a class of all persons who, within the last two years, have been overbilled for water services by Cleveland Water and did not receive an opportunity to contest the bills through a hearing ("Overbilling Class").

(Compl. ¶ 115, ECF No. 1.)

On behalf of themselves and the putative class members, Plaintiffs bring the following

-3-

claims against Defendant: (1) violation of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* ("Count One") resulting from the alleged disparate impact that Defendant's water lien policy has on African-Americans; (2) violation of the Ohio Civil Rights Act, Ohio Rev. Code § 4112.02(H) ("Count Two") resulting from the alleged disparate impact that Defendant's water lien policy has on African-Americans; (3) violation of the Due Process Clause of the U.S. Constitution and the Due Course of Law Clause of the Ohio Constitution ("Count Three") resulting from Defendant's alleged failure to provide customers notice and opportunity to be heard before terminating water service; and (4) violation of the Due Process and Equal Protection Clauses of the U.S. Constitution and the Due Course of Law Clause under the Ohio Constitution ("Count Four") resulting from Defendant's alleged failure to give customers an opportunity to refute their water bills. (Compl. ¶¶ 129, 135, 145, 157–58.)

Defendant filed the Motion considered herein on February 13, 2020, (ECF No. 8), requesting the court dismiss Plaintiffs' Complaint in its entirety. On March 16, 2020, Plaintiffs filed their Response in Opposition. (ECF No. 9.) On March 30, 2020, Defendant filed its Reply. (ECF No. 10.)

## II. LEGAL STANDARD

The court examines the legal sufficiency of a plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6). The United States Supreme Court clarified the law regarding what a plaintiff must plead in order to survive a motion made pursuant to Rule 12(b)(6) in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). When determining whether the plaintiff has stated a claim upon which relief can be granted, the court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible

on its face." *Twombly*, 550 U.S. at 570. The plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the Complaint are true." *Id.* A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The Court, in *Iqbal*, further explained the "plausibility" requirement, stating that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678. Furthermore, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* This determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### III. LAW AND ANALYSIS

Defendant requests the court to dismiss Plaintiffs' Complaint in its entirety. (Mot. at PageID #92, ECF No. 8.) Plaintiffs counter that dismissal is not appropriate. (Opp'n at PageID #129, ECF No. 9.) The court will address each of their arguments in support of their respective positions in turn.

#### A. Count One

In Count One, Plaintiffs allege that Defendant's water lien policy disproportionately impacts African-Americans and constitutes race discrimination against them and the members of the Water Lien Class and Escrow Subclass in violation of the Fair Housing Act. (Compl. ¶¶ 124–31, ECF No. 1.) Defendant argues that Plaintiffs' Complaint is factually insufficient to maintain a Fair Housing

Act claim. (Mot. at PageID #109, ECF No. 8.) In particular, Defendant argues that the Complaint fails to allege that Defendant's policy of converting customers' unpaid water bill debt into water liens causes foreclosures or otherwise makes housing unavailable to African-Americans, and thus fails to satisfy the "robust causality requirement." (*Id.* at PageID #102, 109–10.) The court will explain the "robust causality requirement" below. For the reasons that follow, the court denies Defendant's request to dismiss Plaintiffs' Fair Housing Act claim.

### 1. The Robust Causality Requirement

Liability under the Fair Housing Act arises when a person's actions "make[s] unavailable or den[ies], a dwelling to any person because of race." 42 U.S.C. § 3604(a). The Supreme Court has recognized that disparate impact claims are cognizable under the Fair Housing Act. *See Texas Dep't of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507 (2015); *see also Groach Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Hum. Rels. Comm'n*, 508 F.3d 366, 381 (6th Cir. 2007) ("[A] plaintiff may establish a violation under the [Fair Housing Act] by showing that . . . an otherwise neutral practice has a disparate impact on a protected class."). In doing so, the Court held that the plaintiff is required to show that the challenged practices have a "'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." *Inclusive Cmtys.*, 135 S. Ct. at 2513. Further, the Supreme Court recognized the U.S. Department of Housing and Urban Development's ("HUD") burden-shifting framework that is used to analyze disparate impact claims. *Id.* at 2514. Under the burden-shifting framework, the plaintiff must first make a prima facie showing of disparate impact by proving that the challenged practice has caused or will cause a discriminatory effect. *Id.* Next, the burden shifts to the defendant to prove that the challenged practice is necessary to achieve a substantial, legitimate, nondiscriminatory

-6-

interest. *Id.* at 2514–15. Once the defendant has satisfied its burden, the plaintiff may prevail by showing that the defendant's interest could be served by another practice that has a less discriminatory effect. *Id.* at 2515. At the pleading stage, the court need only consider the first step of the framework; it must determine whether the plaintiff has made out a prima facie disparate impact claim. *Id.* at 2523.

To allege a prima facie case of disparate impact, the Supreme Court provides that the plaintiff must satisfy what it called a "robust causality requirement." *Inclusive Cmtys.*, 135 S. Ct. at 2523. That is, the plaintiff must be able to point to a specific policy of the defendant and provide evidence showing that the policy causes the disparity. *Id.* at 2523 ("a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity"). The "robust causality requirement" ensures that "racial imbalance . . . does not, without more, establish a prima facie case of disparate impact." *Id.* It also prevents defendants from being held liable for racial disparities they did not create. *Id.*

Because the court found no Sixth Circuit precedent or persuasive authority from the district courts within this Circuit addressing the proper interpretation of the "robust causality requirement," the court turns to other circuits for guidance. Other circuit courts interpret the "robust causality requirement" to require the plaintiff to identify a specific policy of the defendant, plead facts demonstrating that this policy disparately impacts a protected class, and offer substantial statistical evidence that sufficiently shows that the defendant's policy caused the disparity. *See*, *e.g.*, *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 425 (4th Cir. 2018) (reversing the district court's dismissal of the plaintiffs' disparate impact claim, and holding the plaintiffs identified a specific policy and presented sufficient evidence, which raised an inference of causation, and thus

satisfied the "robust causality requirement"); *Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo*, 759

F. App'x 828, 835 (11th Cir. 2018) (affirming the granting of summary judgment to the defendant,

and holding that the plaintiffs failed to satisfy the "robust causality requirement" because they did

not present statistical evidence demonstrating that the defendant's policy disproportionately

impacted minorities as compared to non-minorities); *Inclusive Cmtys. Project v. Lincoln Prop. Co.*,

920 F.3d 890, 907 (5th Cir. 2019) (affirming the district court's dismissal of the plaintiff's disparate

impact claim, and holding that the plaintiffs failed to satisfy the "robust causality requirement"

because the statistical evidence that they submitted did not support an inference that the defendant's

policy disparately impacted minorities).

In *Reyes*, the Fourth Circuit addressed whether the district court properly dismissed the

plaintiffs' disparate impact claim at the motion to dismiss stage of litigation. *Reyes*, 903 F.3d at

428–29. In doing so, the Court articulated a three-part test for determining whether a plaintiff has

pled facts sufficient to support a disparate impact claim:

> [First], [t]he plaintiff must begin by identifying the specific [] practice
> that is challenged. [Second, the plaintiff must] demonstrate that the
> disparity they complain of is the result of one or more of the []
> practices that they are attacking . . ., specifically showing that each
> challenged practice has a significantly disparate impact on the
> protected class. . . . [And third,] the plaintiff must offer statistical
> evidence of a kind and degree sufficient to show that the practice in
> question has caused the exclusion [complained of] because of their
> membership in a protected group. Our formulations, which have never
> been framed in terms of any rigid mathematical formula, have
> consistently stressed that *statistical disparities must be sufficiently
> substantial that they raise such an inference of causation*.

*Id.* at 425. (internal citations and quotation marks omitted) (emphasis added).

The landlord-defendant in *Reyes* had a policy, which required all occupants above the age

-8-

of eighteen to provide documentation evidencing their legal status, and providing that the failure to provide the required documentation results in termination of the lease and eviction. *Id.* at 428. In their complaint, the plaintiffs alleged that this policy violated the Fair Housing Act because it disproportionately ousted Latino tenants from their homes and denied them access to affordable housing. *Id.* The plaintiffs presented statistical evidence demonstrating that "Latinos constitute[d] 64.6% of the total undocumented immigrant population in [the state], and that Latinos [we]re ten times more likely than non-Latinos to be adversely affected by the [defendant's p]olicy, as undocumented immigrants constitute[d] 36.4% of the Latino population [living in the defendant's mobile home park] compared with only 3.6% of the non-Latino population." *Id.* Based on this statistical evidence, the plaintiffs asserted that the defendant's policy disproportionately impacted Latinos. *Id.* The Fourth Circuit held that the plaintiffs satisfied the "robust causality requirement" by "asserting that the specific [p]olicy requiring all adult [] tenants to provide certain documents proving [their] legal status was likely to cause Latino tenants at the [mobile home p]ark to be disproportionately subject to eviction compared to non-Latino tenants." *Id.* As a result, the Court held that the plaintiffs established a prima facie case that the defendant's policy disparately impacted Latinos, and that the district court erred in concluding otherwise. *Id.*

In *Oviedo*, the Eleventh Circuit addressed whether the district court properly granted summary judgment in favor of the defendant on the plaintiffs' disparate impact claim. *Oviedo*, 759 F. App'x at 832–33. There, the city-defendant passed a resolution, which set new utility rates for multi-family residences on a per-unit basis. *Id.* at 831. In the complaint, the plaintiffs asserted that this policy had a clear and negative disparate impact on minorities because it deprived them of affordable housing. *Id.* at 832. The plaintiffs maintained that the base charge for water service at

their multi-family residence increased by 2,000% as a result of the per-unit charge. *Id.* Further, to establish disparate impact, the plaintiffs presented statistical evidence showing that the percentage of racial minority heads of households living in their multi-family residence was greater than the percentage of racial minority households throughout the city. *Id.* at 833. The Eleventh Circuit held that the district court correctly found that this evidence only revealed that more minorities lived in the defendant's multi-family residence than lived in the rest of the city, it did not establish a disparate impact. *Id.* at 835. The Court concluded that in order to establish a disparate impact, the plaintiffs needed to present statistical evidence comparing the percentage of racial minorities in the city who were impacted by the policy to the percentage of non-minorities in the city who were impacted by the policy. *Id.* at 835–36. Because the plaintiffs did not present this type of comparative evidence, the Court held the plaintiffs failed to satisfy the "robust causality requirement." *Id.*

### 2. Application of the Standard

In the instant case, Plaintiffs maintain that the City has a policy of converting unpaid water bills into tax liens on its customers' properties twice a year. (Compl. ¶¶ 50–51.) Plaintiffs allege that this policy violates the Fair Housing Act because it disproportionately results in African-Americans risking the lost of their homes (or losing their homes) to foreclosure and eviction. (*Id.* ¶¶ 13–15, 19, 52–72.) In the Complaint, Plaintiffs provided statistical evidence that as of July 2018, Cuyahoga County's population was approximately 30.5% Black, nearly 60% White, and close to 6% Latinx, and that each year, between 2014 and 2018, the City placed significantly more water liens in Black neighborhoods than it did in White neighborhoods. (*Id.* ¶¶ 64, 67–68.) For example, in 2014, of the water liens that Cleveland Water placed in Cuyahoga County, 66.7% were placed in majority-Black Census blocks, while only 22.1% were placed in majority-White Census blocks. (*Id.* ¶ 67.)

-10-

Similarly, in 2017, of the water liens that Cleveland Water placed in Cuyahoga County, 78.9% were placed in majority-Black Census blocks, while only 22.6% were placed in majority-White Census blocks. (*Id.*) Plaintiffs also offered statistical evidence showing that "residents living on blocks with at least one property with a water lien are significantly more likely to be Black than residents living on blocks with no water liens." (*Id.* ¶ 69.) In this regard, Plaintiffs' statistical evidence provided that "Black residents comprised 61.1% of those who live in Cuyahoga County Census blocks where Cleveland Water placed water liens between 2014 and 2018, despite being only 30.5% of Cuyahoga County's population. While approximately 60% of Cuyahoga County's population is [W]hite, only 29.5% of residents living in a Census block with a water lien are [W]hite." (*Id.* ¶ 69.) Based on this evidence, Plaintiffs asserted that the Defendant's water lien policy has a significant disproportionate impact on African-Americans. (*Id.* ¶¶ 70–72.)

As stated above, in order to establish a prima facie disparate impact claim, Plaintiffs must satisfy the "robust causality requirement." *Inclusive Cmtys.*, 135 S. Ct. at 2523. When deciding a motion to dismiss, the court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the plaintiff. *Twombly*, 550 U.S. at 570. Accepting Plaintiffs' statistical evidence as true, the court concludes that Plaintiffs have sufficiently alleged a prima facie case of disparate impact. That is, Plaintiffs have satisfied the "robust causality requirement" by asserting that the City's policy of converting unpaid water bill debt into tax liens on Cleveland Water's customers' homes is likely to cause its African-Americans customers to be disproportionately subject to foreclosure and eviction compared to its White customers. Indeed, like the plaintiffs in *Reyes*, Plaintiffs have alleged substantial statistical evidence which supports an inference that the City's water lien policy caused the disparity.

Accordingly, the court finds that Plaintiffs have made a prima facie case that the City's policy disparately impacts African-Americans in violation of the Fair Housing Act. Thus, the court denies Defendant's request to dismiss Plaintiffs' Fair Housing Act claim.

B. Count Two

Plaintiffs' second cause of action alleges that the City's actions constitute racial discrimination against them and the members of the Water Lien Class and Escrow Subclass in violation of the Ohio Civil Rights Act, Ohio. Rev. Code § 4112.02(H). (Comp. ¶¶ 19, 134, ECF No. 1.) The City argues that Plaintiffs' Complaint fails to sufficiently plead either an intentional discrimination claim or disparate impact claim under the Ohio Civil Rights Act. (Mot. at PageID #112–13, ECF No. 8.) The court will address each of their arguments in turn.

The parties agree that federal case law may be utilized in interpreting claims arising under the Ohio Civil Rights Act. *See Ohio Civ. Rts. Comm'n. v. Harlett*, 724 N.E.2d 1242, 1244 (Ohio Ct. App. 1999) ("When interpreting [Ohio Rev. Code] Chapter 4112, Ohio courts have looked to analogous federal statutes and case law for guidance."); *Linday v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009) ("The analysis of the [plaintiff's] federal housing discrimination claims, as well as their state claim, is governed by the same legal framework."); *Eva v. Midwest Nat'l Mortg. Bank, Inc.*, 143 F. Supp. 2d 862, 890–91 (N.D. Ohio Feb. 15, 2001) ("[B]oth federal and state fair housing claims may be analyzed using federal case law."). As such, the court applies federal case law to examine whether the Complaint satisfies the requirements for each claim.

First, Defendant maintains that the Complaint does not sufficiently plead an intentional discrimination claim under the Ohio Civil Rights Act. (Mot. at PageID #112, ECF No. 8.) In order to survive a motion to dismiss, a plaintiff has to provide enough facts to create a reasonable

inference that the defendant is liable for what they allege. *Iqbal*, 556 U.S. at 678. Conclusory statements are not sufficient to adequately state a claim. *Id.* Although the Complaint alleges intentional discrimination in a few places, (Compl. ¶¶ 136, 147, 159), it includes no supporting facts suggesting that Defendant intentionally discriminated against Black customers of Cleveland Water. Furthermore, in their Opposition, Plaintiffs fail to address this argument, and instead only argue that their disparate impact claim was sufficiently pleaded. (*See* Opp'n at PageID #141, ECF No. 9.) As a result, the court grants Defendant's request to dismiss Plaintiffs' Ohio Civil Rights Act to the extent that it alleges intentional discrimination.

Second, Defendant argues that the Complaint fails to make out a disparate impact claim under the Ohio Civil Rights Act. (Mot. at PageID #113, ECF No. 8.) As stated above, to maintain a disparate impact claim, the plaintiff must identify a specific policy of the defendant and plead sufficient facts demonstrating that this policy causes the disparity. *Inclusive Cmtys.*, 135 S. Ct. at 2523. Adopting the same argument that it made with respect to Count One, Defendant contends that Plaintiffs fail to satisfy the "robust causality requirement" to establish their disparate impact claim under the Ohio Civil Rights Act. (Mot. at PageID #113.) This argument is not well-taken. Indeed, as explained above, Plaintiffs satisfied "the robust causality requirement" in pleading their disparate impact claim under the Fair Housing Act. As a result, the court finds that Plaintiffs have also pleaded sufficient facts to support their disparate impact claim under the Ohio Civil Rights Act.

Consequently, the court grants Defendant's request to dismiss Plaintiffs' Ohio Civil Rights Act claim to the extent that it is based on allegations of intentional discrimination, but denies Defendant's request to dismiss Plaintiffs' Ohio Civil Right Act claim to the extent that it alleges a disparate impact claim.

### C. Count Three

In the third cause of action, Plaintiffs allege that Defendant violated their Due Process rights, under the U.S. Constitution and Ohio Constitution, by failing to provide them with adequate notice before terminating their water service. (Compl. ¶ 138, ECF No. 1.) For this claim to withstand dismissal, Plaintiffs must first demonstrate that they have a property interest in continued water service and provide evidence indicating that Defendant denied them of that property interest without adequate procedural safeguards. *See Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1 (1978). Because the Due Course of Law Clause in the Ohio Constitution is equivalent to the Due Process Clause of the U.S. Constitution, only one analysis is necessary. *In re Hua*, 405 N.E.2d 255, 258 (Ohio 1980). Defendant maintains that Plaintiffs' claims must be dismissed because Plaintiffs do not have a property interest in continued water service. (Mot. at PageID #113–14, ECF. No. 8.) For the reasons explained below, however, this argument is not well-taken.

Both parties recognize that Plaintiffs must demonstrate that they have a property interest in continued water service in order to properly assert a due process claim. *See Mansfield Apartment Owners Ass'n v. City of Mansfield*, 988 F.2d 1469, 1474 (6th Cir. 1993) (finding state law granted the plaintiffs a property interest in continued water service because the state statute forbade the defendant from terminating service without notice and required the defendant to inform the plaintiffs of their right to a hearing). In order to have a property interest in continued water service, Plaintiffs must have a "legitimate claim of entitlement" rather than a "unilateral expectation" to receive the utility. *Midkiff v. Adams Cty. Reg'l. Water Dist.*, 409 F.3d 758, 763 (6th. Cir. 2005) (holding the plaintiffs, who were tenants of the property that had its service terminated, did not have a property interest in continued water service because the state statute did not require notice to be provided to

-14-

the tenants before the defendant could terminate service to non-customers). Property rights that convey the requisite entitlement can be created either by statute or contract. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) ("Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (Property interests "are secured by existing rules or understandings. . . . A written contract with an explicit [] provision clearly is evidence of a formal understanding that supports a [] claim of entitlement . . . . Yet absence of such an explicit contractual provision may not always foreclose the possibility [of a property interest].").

Thus, Plaintiffs would have a legitimate entitlement to continued service if either a statute or contract prohibits Cleveland Water from terminating service without complying with procedural safeguards. The Supreme Court and Sixth Circuit Court have consistently held that when a statute or contract sets procedural safeguards before the defendant utility company has the power to terminate the plaintiff's service, the plaintiff has a protected property interest under the Due Process Clause. *See Craft*, 436 U.S. at 11 (holding "because petitioners may terminate service only 'for cause,' respondents assert a 'legitimate claim of entitlement' within the protection of the Due Process Clause"); *see also Mansfield*, 988 F.2d at 1474. Conversely, when a plaintiff has failed to show that a defendant was bound by contract or that a state statute removed the defendant's ability to terminate service without notice, the Sixth Circuit has held that a property right in continued water service has not been established. *See Midkiff*, 409 F.3d at 763; *Golden v. City of Columbus*, 404 F.3d 950, 956 (6th Cir. 2005) (affirming dismissal of the plaintiff's complaint because she did not provide evidence that she had either a contract that conveyed a property interest or that statutory law protected non-customers from service disconnection).

-15-

As Defendant points out, Cleveland Water is a department of the City, and thus is governed by the City's municipal code, the CCO. (Mot. at PageID #103, ECF No. 8; Reply at PageID #161, ECF No. 10.) In pertinent part, the CCO states:

> Water Service may be terminated at any premises where any water or waste water bill remains unpaid after the date payment is due, subject to the following:
>
> (a) The Division of Water *shall* send to the account holder a notice of termination of service at least fifteen (15) days prior to such termination.

CCO § 535.16 (emphasis added). It is clear from the text of the CCO that Cleveland Water is obligated to provide 15 days' notice to its customers before terminating their water service, and that its ability to terminate water service is expressly precluded in the absence of this notice. Although the obligation to provide notice before terminating water service alone may be enough to create an entitlement that rises to the level of a property interest, the *Colegrove* Order, which the City is bound by, further supports a finding that Plaintiffs have a legitimate entitlement to continued water service.

Indeed, the *Colegrove* Order prohibits Defendant from terminating a customer's water service, except to prevent emergency waste, unless Defendant satisfies a series of procedural requirements. (Consent Decree at PageID #44, ECF No. 1-1.) Under the terms of the *Colegrove* Order, Defendant is required to provide notice to customers whose service they intend to terminate, grant a hearing to enable the customer to contest the reasons for termination upon request, and include in their notice of termination the customer's right to a hearing. (*Id.* at PageID #45–46.) Because Defendant can terminate water service "only upon strict compliance" with the aforementioned procedural requirements, the *Colegrove* Order creates an entitlement to water service for Plaintiffs. (*Id.* at PageID #42.)

-16-

Furthermore, the Supreme Court's decision in *Craft* supports the court's finding. There, the Supreme Court held that the plaintiffs had a "legitimate claim of entitlement" to utility services within the protection of the due process clause because the defendants could not terminate service for nonpayment, when the customer's utility bill is the subject of a bona fide dispute, without first providing the customer with notice and a hearing to adjudicate the dispute. *Craft*, 436 U.S. at 9–11. In the instant case, Defendant is able to terminate service for non-payment and to prevent emergency waste. However, Defendant's ability to terminate water service for non-payment is conditioned on Defendant first providing the customer 15 days' notice. *See CCO* § 535.16 (providing the notice must also inform the customer of their right to an appeal to the Water Review Board). In addition, the *Colegrove* Order, requires Defendant to grant a hearing to customers, like Plaintiffs, who contest their billing or the reasons for termination. (Consent Decree at PageID #44–46, ECF No. 1-1.) As a result, the court finds that Plaintiffs have a property interest in continued water service.

As a final note, Defendant's argument that the Due Process Clause does not protect Plaintiffs because they have no entitlement to water service when they fail to pay their bills is foreclosed by *Craft*. (Mot. at PageID #116, ECF No. 8); *Craft*, 436 U.S. at 11 ("Although the customer's right to continued service is conditioned upon payment of the charges properly due, the Fourteenth Amendment's protection of property . . . has never been interpreted to safeguard only the rights of undisputed ownership." (internal quotation marks omitted)). Similarly, Defendant's argument that analyzing the procedural requirements that empower Defendant to terminate water service presupposes the existence of a property right is unavailing. (Reply at PageID #160, ECF No. 10.) Indeed, the analysis of the procedural requirements is necessary to assess the extent of a defendant's power to terminate service, and this determination establishes whether a plaintiff has a legitimate

entitlement to water service. When a defendant has little authority to terminate service unilaterally, the plaintiff's expectation of service becomes an entitlement, and thus a property interest. As explained above, Defendant is unable to terminate service at all unless it maintains strict compliance with the specific procedural steps created by the CCO and the *Colegrove* Order. This inability to terminate service creates an entitlement, and thus supports the court's finding that Plaintiffs have a property interest in continued water service. As a result, the court denies Defendant's request to dismiss Plaintiffs' Due Process claims.

> D. Count Four

Finally, Plaintiffs Pickett, Johnson, and Montgomery claim that Defendant has violated their and the Overbilling Class's Fourteenth Amendment Rights under both the Due Process and Equal Protection Clauses of the U.S. Constitution, as well as their Due Process rights under the Ohio Constitution. (Compl. ¶ 157, ECF No. 1.) Defendant argues that because these Plaintiffs have failed to demonstrate that they have a property interest in accurate billing, their Due Process claims fail. (Mot. at PageID #116, ECF No. 8.) Defendant also maintains that Plaintiffs' Equal Protection claim fails because they did not plead any allegations of intentional discrimination. (*Id.* at PageID #117.) For the following reasons, Defendant's Motion is granted in regard to Plaintiffs' Equal Protection claim but denied in regard to Plaintiffs' Due Process claims.

**1. Plaintiffs' Due Process and Due Course of Law Claims**

As stated above, the Due Course of Law Clause of the Ohio Constitution and the Due Process Clause of the U.S. Constitution are coextensive. *State v. Anderson*, 68 N.E.3d 790, 794 (Ohio 2016) ("[w]e interpret the Ohio Due Course of Law Clause, Article 1, Section 16 as coextensive with the Due Process Clause"). Thus, to state a claim under either clause, Plaintiffs must

-18-

demonstrate that they have a property interest in receiving accurate billing and that Defendant deprived them of this interest without fair notice and an opportunity to be heard. *See Craft*, 436 U.S. at 9. Property interests can arise from the obligations created by statute or contract. *See Roth*, 408 U.S. at 577; *see also Perry*, 408 U.S. at 601.

The proper method to determine if a plaintiff has a property interest in a utility service is by examining whether the obligations that the defendant utility company has to the plaintiff creates an entitlement. *Craft*, 436 U.S. at 9. Thus, in order to determine whether Plaintiffs have an entitlement to accurate billing, we must examine Defendant's statutory and contractual obligations to their customers. *See Midkiff*, 409 F.3d at 763. Having reviewed the CCO, the court finds that its various provisions create an entitlement to accurate billing that is recognizable as a property interest. First, unlike most companies, Defendant's prices are fixed at specific rates based on usage, and thus Defendant is obligated to only charge customers at the fixed rates unless an exception applies. *See* CCO § 535.04. Next, § 535.08 of the CCO states, "[t]he Director of Public Utilities *shall* assess and collect proper charges for water, materials supplied and work done." (emphasis added). Further, at least one state court has found that CCO § 535.31 creates an obligation on the utility provider to accurately bill its customers. *See Alpha Plaza Inv. v. City of Cleveland Div. of Water*, No. CV16862542, 2017 WL 9496145, at *3 (Ohio Court of Common Pleas, Jan. 20, 2017) ("the City of Cleveland is obligated as a matter of law to **properly** bill parties for water used including adjusting the bill if appropriate") (emphasis in original); *see* CCO § 535.31 ("If the meter fails to register correctly, the customer shall be charged for water at the average daily rate of consumption estimated by the Commissioner of Water, as based upon use under similar conditions when the meter is in good order.").

-19-

Beyond the statutory obligations placed on Defendant, the *Colegrove* Order requires Defendant to give customers who dispute the accuracy of their water bill an opportunity to defend themselves in front of the Water Review Board. (Consent Decree at PageID #45, ECF No. 1-1.) It also compels Defendant to check a customer's water meter in order to ensure accuracy and requires Defendant to lower the cost of a bill when it discovers an inaccuracy. (*Id.* at PageID #48.) Collectively, these statutory and contractual obligations create a justified entitlement to accurate billing, and this entitlement creates a property interest that is protected by the Due Process Clause and the Ohio Constitution's Due Course of Law Clause. As a result, the court denies Defendant's request to dismiss Plaintiffs' Due Process and Due Course of Law claims.

### 2. Plaintiffs' Equal Protection Claim

To support a claim under the Equal Protection Clause of the Constitution, a plaintiff must demonstrate that the state has intentionally discriminated against them. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). It is not enough to prove a disparate impact. *Id.* ("[An] official action will not be held unconstitutional solely because it results in a racially disproportionate impact. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination."); *see also Spurlock v. Fox*, 716 F.3d 383, 400 (6th Cir. 2013) ("disparate impact standing alone… does not establish a constitutional violation"); *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194–95 (2003) (holding that the plaintiffs must demonstrate state action and intentional discrimination to support a claim under the Equal Protection Clause). As the Supreme Court has articulated, a plaintiff may prove invidious discriminatory purpose by presenting evidence of the following: (1) the historical

background of the decision; (2) the sequence of events leading up to the challenged decision; (3) departures from the normal procedural sequence; (4) substantive departures from usual factors of decision making; and (5) legislative or administrative history. *See Arlington Heights*, 429 U.S. 267–68.

Plaintiffs' Complaint is bare of any facts suggesting invidious discrimination, whereas it contains substantial allegations and facts concerning their disparate impact claims. (*See* Compl., ECF No. 1.) Though the Complaint states that Defendant intentionally discriminated against Plaintiffs, (Compl. ¶¶ 136, 147, 159), it provides no facts to support these allegations. As a result, Plaintiffs' claim must fail. *See Twombly*, 550 U.S. at 555 (holding "labels and conclusions" are insufficient to maintain a claim). Furthermore, as the Supreme Court has held, evidence of disparate impact is not enough to support a claim of intentional discrimination under the Equal Protection Clause. *See Arlington Heights*, 429 U.S. at 264–65.

Plaintiffs argue that the proper standard to analyze their Equal Protection claim requires the court to consider whether "the government treated the plaintiff differently from a similarly situated party." (Opp'n at PageID #147, EFC No. 9 (citing *EJS Props. LLC v. City of Toledo*, 698 F.3d 845, 864 (6th Cir. 2019)).) However, this is simply not the standard that is applied in cases such as this—a class action case. To the contrary, the "similarly situated" standard is specifically applied in "class of one" Equal Protection cases to enable individual plaintiffs who have been "irrationally singled out" by government actions to gain redress when "class-based discrimination" cannot be shown. *Engusit v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008). In this case, Plaintiffs are alleging class-based discrimination claims. (*See* Compl., ECF No. 1.) Because Plaintiffs' Equal Protection claim is brought on behalf of Plaintiffs and the Overbilling Class, (Compl. ¶ 115), they

are required to plead facts that indicate that Defendant intentionally discriminated against them as set forth in *Arlington Heights*, 716 F.3d at 267–68. Yet, as noted above, the Complaint is bare of any such allegations. As a result, Plaintiffs' Equal Protection class action claim fails. Therefore, the court grants Defendant's request to dismiss this claim.

### E. Damages under Ohio's Civil Rights Act

Finally, Defendant asks the court to deny Plaintiffs' request for money damages for their Ohio Civil Rights Act claim, Ohio Rev. Code § 4112.02, (Count Two). (Mot. at PageID #118, ECF No. 8.) As Defendant correctly points out, Ohio Rev. Code § 2744.02(A)(1) grants Defendant immunity from liability for monetary damages for acts and omissions in connection to any of its proprietary functions. (Mot. at PageID #118, ECF No. 8.) Plaintiffs concede that they cannot collect damages under the Ohio Civil Rights Act, and maintain that they are not seeking such damages. (Opp'n at PageID #148.) Thus, the court grants Defendant's request to dismiss Plaintiffs' claim for damages under the Ohio Civil Rights Act.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion (ECF No. 8) is granted in part and denied in part. Specifically, the court hereby:

(1) Denies Defendant's request to dismiss Count One;

(2) Grants Defendant's request to dismiss Count Two to the extent that it is based on allegations of intentional discrimination, but denies the request to the extent that Count Two asserts a disparate impact claim;

(3) Denies Defendant's request to dismiss Count Three;

(4) Denies Defendant's request to dismiss Count Four to the extent Count Four asserts Due

Process violation claims, but grants the request to dismiss Count Four to the extent it asserts an

Equal Protection claim; and

      (5) Grants Defendant's request to deny Plaintiffs' request for money damages under the Ohio

Civil Rights Act.

      IT IS SO ORDERED.


                             */s/ SOLOMON OLIVER, JR.*
                             UNITED STATES DISTRICT JUDGE


September 29, 2020

-23-